IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

DENNIS STEPHENSON,                )
                                  )
    Plaintiff,                    )
                                  )
                                  )    Case No. 2:15-CV-04180-NKL
v.                                )
                                  )
                                  )
POTTERFIELD GROUP LLC,            )
MIDWAY ARMS, INC d/b/a            )
MIDWAYUSA, and                    )
LARRY POTTERFIELD                 )
                                  )
    Defendants.                   )

# ORDER

Before the Court is Defendants' Motion for Summary Judgment [Doc. 41]. For the following reasons, Defendants' motion is granted in part and denied in part.

## I.    Background

Defendant Larry Potterfield is the Chief Executive Officer of Midway Arms, Inc. and the President of Potterfield Group, LLC. [Doc. 42, p. 1 n.1]. Plaintiff Dennis Stephenson worked for Defendants "in various roles" from 2002 through 2015. Plaintiff was first hired at Battenfeld as an hourly Assembly Warehouse Specialist in 2001 and eventually became Vice President of Operations there. *Id.* Plaintiff's last held position was "Director of Facilities" at Potterfield Group. [Doc. 46, p. 1]. As Director of Facilities, Plaintiff was responsible for "overseeing the expansion" of a company project called the "Midway campus," "including repairs and renovations," "managing the farms purchased by Potterfield Group or other entities, which included working with the Farm Services Agency and working with utilities to remove power

poles from the farm properties," "work[ing] with local governments on planning and zoning matters involving the Midway campus and other properties," and doing "personal work for the Potterfield family." [Doc. 42, pp. 4–5]. Mr. Potterfield was Plaintiff's direct supervisor from December 2009 until August 2015.

### A. 2013 FMLA Leave

In June 2013, Plaintiff informed Larry Potterfield and other Potterfield Group employees that he had been diagnosed with prostate cancer, and would require treatment. Plaintiff requested and was approved for leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and took leave from July 29–August 19 to undergo and recover from surgery. [Doc. 42, p. 7]. Shortly after Plaintiff returned to work in August, 2013, Plaintiff was also diagnosed with Chronic Lymphatic Leukemia. Plaintiff informed Mr. Potterfield and other employees of his diagnosis, but told them that he did not need immediate treatment for that condition.

After Plaintiff returned from his FMLA leave, Defendant added additional daily reporting requirements and additional duties, requiring Plaintiff to spend "an additional 5–10 hours per week" completing assigned projects. [Doc. 46-1]. Mr. Potterfield's tone "became increasingly negative" towards Plaintiff and he was no longer invited to participate in Potterfield social gatherings like he was prior to leave. *Id.* Mr. Potterfield disputes this allegation. Additionally, while working as Director of Facilities for Potterfield Group, Plaintiff had "received a raise each year since 2009."[1] Mr. Potterfield states he set a maximum salary for the position in late 2013 and that was the reason no raise was given. Finally, Plaintiff received an additional sum of money for his work at Potterfield Group in 2011, 2012, and 2013 for work performed in the previous year. [Doc. 46, pp. vi–vii]. Plaintiff did not receive any bonus or "personal thank you

---

[1] Plaintiff alleges this is the first time that he had not received an annual raise from Potterfield Group since 2009 and the first time ever "in his 12-year tenure with the company." [Doc. 46, p. xvi].

2

check" in 2014 or 2015.

### B. 2015 FMLA Leave

In June 2015, Plaintiff informed Mr. Potterfield that, as a result of his Leukemia, he needed to begin chemotherapy treatment "starting early in July of 2015, and continuing for intervals thereafter." *Id.* at 8. Plaintiff requested and was approved for FMLA leave to receive these treatments; he took leave from July 1–July 7 and again from July 29–August 3.

In July 2015, while Plaintiff was on leave, Mr. Potterfield and his wife, Brenda, were on vacation. Ms. Potterfield received a phone call from their daughter, Sara Potterfield—who serves as Vice President of Public Relations at Potterfield Group—relaying a report from another employee that "Plaintiff had engaged in inappropriate and unprofessional conduct." *Id.* at 9. On July 28, 2015, Ms. Potterfield met with Mackenzi Wells—an Administrative Assistant at Potterfield Group—and Ms. Wells "told her that Plaintiff engaged in inappropriate conduct," including "the kiss face" (alleging Plaintiff made "kissing face" gestures to her) and "the grabbing the hips and biting the lip thing in the hallway" (relating to what Ms. Wells deemed to be inappropriate touching by Plaintiff). [Doc. 46-6]. Ms. Wells further noted that Plaintiff "makes inappropriate jokes" and said disrespectful things about the Potterfields. *Id.* Ms. Potterfield also spoke with Tiffany Martin—a Midway Arms Financial Services Accountant—who described an incident in which Plaintiff "twirled her around in her chair and put his hands on both armrests, 'invading [her] personal space.'" [Doc. 42, p. 10].

During and following Ms. Potterfield's interviews with Potterfield Group employees, Mr. Potterfield "became concerned about Plaintiff's conduct directed at female employees, and questioned Plaintiff's loyalty to the Potterfield Group and the Potterfield family." *Id.* at 11. Mr. Potterfield asked Stan Frink, Vice President of Human Resources at Midway Arms (the entity

that handles FMLA applications for Potterfield Group), to investigate further. During Mr. Frink's investigation, he spoke to, amongst others, Ms. Martin, who told him that Plaintiff made "inappropriate physical gestures that made her uncomfortable," which included but were not limited to his making "kissing faces" to her when he walked past her work area. *Id.* Mr. Frink also interviewed another employee, Bridget Biesemeyer, who told him that Plaintiff was uncomfortable with the way Plaintiff "invaded her personal space." *Id.* at 12.

Mr. Frink and another Midway Arms Human Resources employee, Lisa Pilkington, interviewed several more female employees. Mr. Frink reported his findings to Mr. Potterfield on July 31, 2015, at which time Mr. Potterfield "had decided to eliminate Plaintiff's position as Director of Facilities." *Id.* at 13. Upon returning to work on August 3, 2015 after receiving his second round of chemotherapy treatment, "Larry Potterfield told Plaintiff that his position was being eliminated and that if he resigned and signed a severance agreement, he could stay in the office for 30 days and receive full compensation until the end of October." *Id.* Plaintiff refused to resign. [Doc. 46, p. 18]. On August 4, 2015, Mr. Frink, on Mr. Potterfield's direction, informed Plaintiff that his position had been terminated and escorted Plaintiff from the building. *Id.*

Plaintiff filed suit on August 18, 2015, two weeks after Mr. Potterfield terminated his employment—or decided to "eliminate the position" [Doc. 50, p. 32]—alleging violations of the FMLA on two separate occasions: first, when the "terms and conditions" of Plaintiff's employment changed following his FMLA leave in 2013; and second, when his employment was terminated following his FMLA leave in 2015. [Doc. 42, pp. 10–11]. Defendants contend that the terms and conditions of his employment did not change, and that his termination was in response to Plaintiff's decreasing responsibilities, "Plaintiff's conduct directed at female employees," and questions regarding "Plaintiff's loyalty to the Potterfield Group and the

4

Potterfield family." *Id.* at 11. Defendants have filed a Motion for Summary Judgment, [Doc. 41].

## II. Discussion

A motion for summary judgment "is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. Mo. 2011) (citation omitted). "A judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 868 (8th Cir. 2015) (citation omitted).

The FMLA entitles an employee to twelve workweeks of leave during any twelve-month period if the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). The FMLA recognizes two types of claims: interference claims, "in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA;" and retaliation claims, "in which the employee alleges that the employer discriminated against him for exercising his FMLA rights." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006). The claims differ in that "the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Id.* Plaintiff asserts interference and retaliation claims against Defendants.

### A. Plaintiff's Interference Claim

An employer's action "that deters an employee from participating in protected activities constitutes an 'interference' or 'restraint' of the employee's exercise of his rights." *Id.* at 1050

(citation omitted). "Interference includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Id.* (citing 29 C.F.R. § 825.220(b)). "When an employer attaches negative consequences to the exercise of protected rights, it has 'chilled' the employee's willingness to exercise those rights because he or she does not want to be fired or disciplined for doing so." *Stallings,* 447 F.3d at 1050 (citation omitted).

The Eighth Circuit differentiates between interference and retaliation claims using an analysis set forth in *Stallings*. In that case, an employee requested and was approved to take FMLA leave to care for his father. *Id.* at 1044. He later requested non-FMLA vacation leave, and when it was denied, he requested and was approved to take FMLA leave for that same time period. After returning to work, the employer terminated the plaintiff for "giving false reasons for use of leave time." *Id.* The plaintiff then filed suit against his former employer, claiming both interference and retaliation claims under the FMLA. The District Court found that, under those facts, the plaintiff's claim could only be analyzed as retaliation. *Id.* at 1051.

The Eighth Circuit affirmed, noting that the employer "granted every request [the plaintiff] made to take FMLA leave" and, as such, the employer never "impeded [the plaintiff's] use of FMLA leave" even though the plaintiff was terminated upon his return. *Id.* Although "every discharge of an employee while [he] is taking FMLA leave interferes with an employee's FMLA rights, . . . the mere fact of discharge during FMLA leave by no means demands an employer be held strictly liable for violating the FMLA's prohibition of interfering with an employee's FMLA rights." *Id.* at 1051 (citation omitted). "Therefore, Stalling's claim is fundamentally a claim for retaliation and should be analyzed as such." *Id.*

The Eighth Circuit has consistently "adhered to the Stallings interference/retaliation dichotomy" that classifies termination following FMLA leave as a retaliation claim because the

6

plaintiff's alleged discrimination "occurred after [he] took FMLA leave, not denial of, or interference with, [his] leave." *Lovland v. Emplrs Mut. Cas. Co.*, 674 F.3d 806, 811–12 (8th Cir. 2012); *see also Quinn v. St. Louis County*, 653 F.3d 745, (8th Cir. 2011); *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011); *Bacon v. Hennepin Cnty. Med. Ctr.*, 550 F.3d 711 (8th Cir. 2008); *Phillips v. Mathews*, 547 F.3d 905 (8th Cir. 2008).

In this case, Plaintiff applied for and was approved to take FMLA leave in 2013 and 2015. Although Plaintiff seems to allege his willingness to utilize his rights under the FMLA were "chilled" by negative consequences after his FMLA leave in 2013, nothing in the record suggests that is the case. Plaintiff has not identified a time when he was deterred from applying for FMLA leave, nor a time when he was denied FMLA leave.

Because Plaintiff has failed to present sufficient evidence that Defendants interfered with his rights under the FMLA, Plaintiff's claim is analyzed only as an FMLA retaliation claim.

### B. Plaintiff's Retaliation Claim

To analyze retaliation under the FMLA, a court employs the *McDonnell Douglas* burden-shifting test. *Stallings,* 447 F.3d at 1051 (citation omitted). The plaintiff must show that "1) he engaged in protected conduct; 2) he suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct." *Chappell v. Bilco Co.*, 675 F.3d 1110, 1117 (8th Cir. 2012). If this prima facie showing is made, the burden then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse action, and then shifts back to the plaintiff to show that the defendant's reason is a pretext for discrimination. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006). The plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him or her for having engaged in protected activity under the

FMLA. *McDonnell Douglas*, 411 U.S. at 804.

The protected conduct that Plaintiff engaged in was utilizing his FMLA leave during 2013 and 2015. Plaintiff asserts that he has suffered materially adverse employment actions in 2013 including "longer [working] hours," "additional reporting duties," and "negative financial consequences," and in 2015, when his employment was terminated.

### 1. 2013 FMLA Leave

A materially adverse action is any action that would dissuade a reasonable employee from exercising her rights under the FMLA. *Quinn v. St. Louis County*, 653 F.3d 745, 754 n.9 (8th Cir. 2011). Regarding the changed "terms and conditions of his employment" in 2013, [Doc. 50, p. 20], Defendants contend that the "increased scrutiny and decreased personal interaction" do not constitute adverse employment actions, because "materially adverse employment action[s] cannot be trivial; [they] must produce some injury or harm." [Doc. 50, pp. 18–19] (citing *Ham-Jones v. United Airlines, Inc.*, 2012 WL 4358004, *4 (E.D. Mo. 2012)).

In this case, however, Plaintiff alleges these actions contemporaneously with "an additional 5–10 hours" of work per week as well as financial consequences. An adverse employment action is a "tangible change in working conditions that produces a material employment disadvantage." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). A material disadvantage may include "actions short of termination" such as "a change in salary, benefits, or responsibilities." *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003). While employees are generally not entitled to salary increases or bonuses, Plaintiff had received a lump sum of money in addition to his salary—be it a bonus or "personal gift"—in each of the three years preceding his FMLA leave and he had be given a salary raise each year since he began working for Defendants in 2002. [Doc. 46, pp. 8–9]. A reasonable jury could find

8

that Defendants' actions constitute a materially adverse employment action.

Plaintiff must still establish causation in order to meet his prima facie burden, i.e. the Plaintiff must show that the adverse action occurred because he requested and took FMLA leave. Over a six month period following his FMLA leave, Defendants' added additional reporting duties, froze Plaintiff's salary, and refrained from giving Plaintiff a bonus. [Doc. 46, p. 9]. Standing alone, that temporal proximity likely does not establish causation. *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) ("Cases in which we have determined that temporal proximity alone was sufficient to create an inference of the causal link have uniformly held that the temporal proximity must be 'very close.'") (citation omitted). But "[a] pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." *Smith v. Allen Health Sys.*, 302 F.3d 827, 832 (8th Cir. 2002); *see also Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105-6 (8th Cir. 2000). An employee may "shorten the gap between [his] protected activity and the adverse action by showing that shortly after [he engaged in the protected activity, the employer] took escalating adverse and retaliatory action against her." *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 503 (8th Cir. 2005).

In *Hite,* the Eighth Circuit looked to the "pattern of adverse activity" spread out over six months, noting that the defendant employer confronted the plaintiff about taking FMLA leave and more closely scrutinized her work. *Id.* at 863–67. Additionally, the Court emphasized that the defendant—the 'ultimate decision-maker'—was aware that the plaintiff had taken FMLA leave. In this case, Defendants admit that prior to Plaintiff's FMLA leave, "he and Mr. Potterfield would frequently discuss projects and [Plaintiff] was then trusted to independently manage the Defendants' properties as the two of them agreed." [Doc. 50, p.19]. Almost immediately upon returning from that leave, Plaintiff had increased reporting requirements and

Defendant hired an additional employee to do some of the work Plaintiff had previously handled alone. [Doc. 50, pp. 18–19]. Defendants do not dispute that Plaintiff did not receive a raise for the first time since joining Defendants' employ, and also did not receive a bonus. *Id.* at 23. Finally, the record shows that Mr. Potterfield—the ultimate decision-maker at Potterfield Group—was aware of Plaintiff's FMLA leave. A reasonable jury could find that this "pattern of adverse activity" following Plaintiff's FMLA leave was caused by a retaliatory motive.

The burden then shifts to Defendants to offer proof of a non-discriminatory motive for its actions. *Stallings*, 447 F.3d at 1051-1052 (8th Cir. 2006). Defendants contend that the increased reporting requirements and decreased personal interaction "are immaterial to this matter" because "[t]he Eighth Circuit has consistently held that a materially adverse employment action cannot be trivial; it must produce some injury or harm." [Doc. 50, p. 5] (citing *Ham-Jones v. United Airlines, Inc.*, 2012 WL 4358004, *4 (E.D. Mo. 2012)). Defendants also argue that—if relevant—the additional reporting requirements were put in place in response to the easing of Plaintiff's responsibilities as additional personnel were hired and "construction on Midway's campus was winding down." [Doc. 42, p. 5]. With regard to the financial consequences, Mr. Potterfield told Plaintiff that he "was doing a good job but he felt that this job had topped out on wages." [Doc. 50, p. 24]. Defendants also contend that "Potterfield Group employees [were] not eligible for bonuses" in 2013. Defendants argue that, due to decreased job responsibility and additional personnel, the salary had reached its maximum level. Mr. Potterfield explained "Plaintiff did not have enough work to do to keep him busy." [Doc. 42, p. 26].

Having proffered non-discriminatory reasons for Defendants' actions, the burden then shifts back to Plaintiff to prove those reasons are pretextual. *Stallings*, 447 F.3d at 1052 (citation omitted). Under Eighth Circuit precedent, a Plaintiff may prove pretext "indirectly by showing

10

Case 2:15-cv-04180-NKL   Document 56   Filed 09/19/16   Page 10 of 16

that the employer's proffered explanation is unworthy of credence" or "directly by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* (citations omitted). Plaintiff contends that the facts underlying Defendants' proffered reason remain disputed, and that those facts evince why Defendants' reasons are unworthy of credence. Namely, Plaintiff disputes that "construction [on the Midway campus] was coming to a close" and whether other employees "were handling most of the duties previously handled by Plaintiff," both of which Defendants offer as evidence of Plaintiff's decreasing job responsibilities. [Doc. 46, p. iv]. The parties also dispute the reasons behind the increased daily reporting requirements. *Id.* at v. Insofar as Plaintiff contends he received a bonus in each of the three years preceding his first FMLA leave, Defendants dispute whether the 2012 check was a "personal thank you" or a bonus for his work in the previous year. *Id.*

Viewing the evidence in the light most favorable to the nonmoving party, a genuine dispute of material fact exists as to whether Defendants' proffered reasons for freezing Plaintiffs' wages, adding additional reporting duties, and denying Plaintiff a bonus were pretextual.

### 2. 2015 FMLA Leave

"Unquestionably, termination is an adverse employment action." *See Wierman*, 639 F.3d at 999. Plaintiff must then prove that his termination was causally linked to his FMLA leave. Plaintiff points to his employment record prior to 2013, along with the timing of these actions, as such evidence. Mr. Potterfield admits that "from the time [Plaintiff] transferred to the Potterfield Group in 2009 until at least mid-2014, [Plaintiff]'s work always met expectations" and that Mr. Potterfield received compliments on Plaintiff's work from business contacts outside of Potterfield Group. [Doc. 50, p. 17]. Mr. Potterfield stated that, prior to Plaintiff's diagnosis, he never considered suspending or terminating Plaintiff's employment.

11

Plaintiff thus asserts his prima facie case is met due to the "temporal proximity" between his FMLA leave and the alleged adverse employment actions; he was terminated "within 45 days of [Plaintiff] beginning his 2015 FMLA leave; and just one day following his return from that leave." [Doc. 46, p.9]. *See Hite v. Vermeer Mfg. Co.*, (8th Cir. 2006) ("An employee can establish a causal link between her protected activity and the adverse employment action through 'the timing of the two events.'"); *Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2002) ("This holding is consistent with the overarching philosophy of the *McDonnell Douglas* system of proof, which requires only a minimal showing before requiring the employer to explain its actions."). The timing of his termination—as part of a pattern of adverse actions discussed above—is sufficient to establish causation.

The burden then shifts to Defendants. "The defendant's burden 'is not onerous and the showing need not be made by a preponderance of the evidence.'" *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051-1052 (8th Cir. 2006) (citation omitted). Defendants have proffered alternative, nondiscriminatory reasons for the termination: decreased job responsibilities, Plaintiff's conduct towards female employees, and questions surrounding his loyalty to Potterfield Group and the Potterfield family. Under the *McDonnell Douglas* burden shifting framework articulated above, "[t]he ultimate question of proof—the burden of which remains on the employee throughout the inquiry—is whether the employer's conduct was motivated by retaliatory intent." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006).

Thus, in order to survive Defendants' Motion for Summary Judgment, Plaintiff "must then identify evidence sufficient to create a genuine issue of material fact whether [Defendants'] proffered explanation is merely a pretext for unlawful retaliation." *Id.* (citation omitted). The evidence supporting an employee's prima facie case may be considered in determining whether

the employer's explanation is pretextual. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (U.S. 1993). Finally, "the employee 'may concede that the proffered reason for the termination would have been a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the true reason for the action.'" *Stallings*, 447 F.3d at 1052 (citation omitted).

Under Eighth Circuit precedent, "[a]n employee may prove pretext by . . . demonstrating that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies." *Id*. "In order to succeed, [Plaintiff] must both discredit defendants' asserted reasons for his termination and show that the circumstances permit drawing a reasonable inference that the real reason for his termination was retaliation." *Hutton v. Maynard*, 812 F.3d 679, 684 (8th Cir. 2016) (citation omitted).

### a. Defendants Alleged Changed Explanation for Termination

Plaintiff argues that Mr. Potterfield changed his explanation as to why Plaintiff was terminated. Specifically, Plaintiff claims—and Defendants admit—that "[w]hen first asked during his deposition about the circumstances of [Plaintiff's] termination, Mr. Potterfield replied that "I didn't fire [Plaintiff] . . . we eliminated the position." [Doc. 50, pp. 33–34]. Mr. Potterfield cited the decreased workload and gradual reduction of work at the Midway campus as his reasoning for "eliminating the position." [Doc. 46-2, pp. 5–6]. In that same deposition, Mr. Potterfield later testified that "when I got these facts" regarding the investigation into Plaintiff's behavior, he "made the decision" that Plaintiff "had to go." *Id.* at 34; [Doc. 46-2, pp. 7–8]. The facts Mr. Potterfield was referring to included notes from an August 5, 2016 interview, two days after Plaintiff had been terminated. Defendants argue that Mr. Potterfield simply misspoke, and that the other facts in the investigation were reported to him prior to August 3.

Mistaken chronology notwithstanding, the record shows that Mr. Potterfield originally

13

told Plaintiff, and recited the statement in his deposition, that he was not being fired, but rather that his position had been eliminated. He noted the decreased workload and additional employees covering Plaintiff's tasks and offered to allow Plaintiff to remain employed for an additional thirty days in addition to a severance package. The allegations of inappropriate conduct were not discussed with Plaintiff, and had Plaintiff elected to remain for those thirty days, nothing in the record suggests he would have been counselled about his behavior. [Doc. 42, p. 16]. Mr. Potterfield later changed his classification, saying that Plaintiff "had to go" because of the results of an investigation, noting Plaintiff's conduct towards female employees and comments about the Potterfield family. Defendants' briefings on their current motion are almost entirely focused on the latter explanation, specifically on the investigation findings.

"Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Smith v. Allen Health Sys.*, 302 F.3d 827, 835 (8th Cir. 2002) (citing *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994)). The Eighth Circuit has found that an employer shifting its reasons from "failing to notify" of an absence to "fail[ing] to notify in the proper manner" was relevant evidence of pretext and created a genuine dispute of material fact to survive summary judgment. *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 867 (8th Cir. 2015). The far greater shift in this case—from eliminating a position to terminating an employee for misconduct—is likewise evidence that supports an inference of pretext.

### b. Defendants Alleged Policy Deviation

Plaintiff also alleges—and Defendants admit—that other complaints of inappropriate workplace conduct were handled differently. *See* [Doc. 46, pp. 12–13, Doc. 50, p. 31–32].[2] Specifically, in "every other instance," Mr. Frink and Ms. Pilkington confirmed that "the

---

[2] Defendants contest the characterization of "other work place conduct investigations" because they claim it is based on "one other" investigation. [Doc. 50, pp. 31–32]. Defendants' responses to Plaintiffs' "List of Material Facts" 167, 168, and 169 allow the Court to characterize it as such here.

14

implicated employee was interviewed and given the opportunity to explain their side of the story," and that "[t]hose employees were not summarily separated from their employment." [Doc. 50, p. 32]. Conversely, Plaintiff "was never afforded the opportunity to address the allegations," as Plaintiff was not informed of these claims during his employment, and argues that he would have "categorically denied" the allegations had he been given such opportunity. [Doc. 46, p. 6].

In most cases that denied summary judgment because the employer deviated from its established policy, the employee must point to similarly situated employees that were treated differently. *See, e.g.*, *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 868 (8th Cir. 2015). Although the record does not contain details about the referenced "other instances," Plaintiff has alleged, and Defendants have admitted, that investigations into employee conduct have been handled differently "in every other instance." Under the Eighth Circuit precedent, "An employee can prove pretext by showing the employer meted out more lenient treatment to similarly situated employees who were not in the protected class, or as here, did not engage in protected activity." *Marez v. St.-Gobain Containers, Inc.*, 688 F.3d 958, 964 (8th Cir. 2012); *see also Erickson v. Farmland Indus.*, 271 F.3d 718, 727 (8th Cir. 2001) ("Another common method of proving pretext is to show that it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case."). Plaintiff has raised a genuine issue of material fact as to whether similarly situated employees—those investigated for workplace misconduct—were treated differently.

To be sure, the Court does not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th

15
Case 2:15-cv-04180-NKL   Document 56   Filed 09/19/16   Page 15 of 16

Cir. 1995). Yet, viewing the evidence in the light most favorable to the nonmoving party, Plaintiff has raised a genuine dispute of material fact as to whether Defendants' proffered non-retaliatory reasons for terminating Plaintiff were pretextual and "unworthy of credence."

## III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. 41] is granted as to Plaintiff's interference claim and denied as to Plaintiff's retaliation claim.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: September 19, 2016
Jefferson City, Missouri

16
Case 2:15-cv-04180-NKL   Document 56   Filed 09/19/16   Page 16 of 16